Ruffin, Chief Justice,
after stating the case as above, proceeded as follows: It was said by the counsel for the defendant, that the argument against him rests upon the assumption that all such transactions are fraudulent, rather than upon proof of any fraud in this case. To the Court, however, it seems, that both upon a general principle of presumption against such dealings, and upon the particular circumstances of this case, the plaintiff must be relieved.
There is very little doubt as to any material fact. It may, however, be remarked in the beginning, that the Master must be mistaken in reporting the value of the fee in the land at $100, for he himself makes the rent for only seven years $175. The ground also for deeming Steele Buffalow’s life good for 10 or 15 years is unsatisfactory. Only one witness thinks so, and he had but little knowledge of Him, and judges only from his appearance when the deeds were executed. Several others, who knew him well, describe his age, habits and state of health in such terms as establish a moral improbability that his life would endure much beyond the period it had then attained; which was, indeed, the ordinary limit of human life. It is apparent that this man’s was almost as poor a life as could have been selected.
It is quite plain that this affair arose on the sudden, out of *249 the legal proceedings instituted against the plaintiff’s father, and that the contract was not deliberately considered by him aor by any one for him; but that he was drawn into it, or suffered to run into it, without advice of counsel or consultation with friends, excepting only the very person to whom the conveyances were made, and who then had the entire confidence of the donor, and all the influence over him which such confidence in a friénd, near relation, adviser and agent would produce in a weak 'and distressed man. The case, we think, is within the policy which corrects under-hand agreements between attorney and client.
It is not pretended that such an arrangement had been thought of, before the 6th day of October, 1831. There was no dissatisfaction between the plaintiff and his father, and no previous purpose of the latter to advance the nephew in exclusion of the natural object of his affection.. On the day mentioned, the old man came to town on a visit to his nephew. As soon as he arrived, his difficulties commenced; and he naturally had recourse to his nephew for advice and assistance. While engaged in relating what had occurred, two other warrants are served on him, and he is informed of three indictments being found. Being instantly taken before the magistrate, and in dread of imprisonment, he requested, or> as the answer has it, “ invited” his relation to attend and assist him. Gan it be doubted that the uncle was deemed, or, at least, felt himself incapable of contending with his adversaries, and that John Buffalow went for the purpose of managing thecases before the magistrate, or settling them with the party? A singlefact, if there were nothingelse, suffices to bring us to that conclusion. It is the fact disclosed in the answer, that the accused confessed his guilt to his nephew. Why? Not by way of appeasing the opposite party or satisfying justice; for then it would have been disclosed to the magistrate. It was, then, to John Buffalow, as a competent and confidential friend, that he might understand the whole case, and be the better qualified to advise a defence or settlement. A confidence thus gained, and for such purposes, brings the case within the reason of the rule alluded to. It is true, these persons did not literally bear the names of attorney and client,. *250 but they did substantially. The cases were triable before a of the peace out of Court; before whom attornies do not appear. But, services to be rendered there, similar to. those of a professional man in Court, invest the person, from whom the services are to come, with the character of solicitor, for the purposes of the rule. This man had influence to gain the secret of his uncle, and thus held him in subjugation; and the secret must have been imparted with a view to the more advantageous conducting of th;e business. There was, then, in fact, a relation of employer and agent between these parties, under circumstances in which much confidence would probably be placed, and entire confidence was actually placed, by the former in the latter. The rule on which the Court interferes between attorney and client would be a lifeless skeleton, unless animated by a principle which will enable it to embrace all cases of the abuse of the like confidence* Had an attorney drawn a client into the agreement during the continuance of the relation between them, or as a condition of undertaking his case, there could be no hesitation to annul it. We think it woidd be equally mischievous to allow this defendant to retain the advantage he has attempted to gain. The Court must be watchful against contracts inconsistent with the fidelity that ought to characterize all the intercourse between one who undertakes for another, who is dependent on his skill and integrity. There are many circumstances in this case, which shew it to be a proper one for the application of the principle; for, it seems to us, that these conveyances were obtained upon an inadequate consideration, and by surprize, from a very weak man, who thought himself secure in the hands of a friend.
In the first place, it is a matter of some astonishment, that we do not find any evidence of Steele Buffalow’s guilt of the offences imputed to him. It is true, that there is a plea of guilty on the records of the indictments. But the answer admits that was not the plea of Steele Buffalow, but was pleaded by his nephew, for him, and while he was on his death bed. We cannot assume his guilt, without some evidence of it; and taking him to have been innocent, the defendant’s cáse, is, indeed, barefaced.
*251 But, supposing him to be guilty, there would remain insuperable objections to the transaction. The defendant does ,. , . , , , i , not estalish any debts owing by the donor, or even if the answer be looked at, on this point, only to the amount of $200. Then the consideration of the deed, was, substantially, the maintenance ofthe uncle, during the short remnant of his days — that was, in reality, almost nothing — he died in six months. For that, the defendant took absolute conveyances of all his uncle’s property, without leaving in him the right to any thing, in any event; and the value of the effects thus conveyed must have been at least one thousand dollars. It is an obvious remark, that the maintenance the old man actually cost the nephew only at the rate of $50 a year; and, therefore, would be satisfied by the annual profits of the property. But, it is said, that the manintenance, as stipulated for by the defendants, was worth $150; and that the change was at the request of the uncle, and, therefore no violation of the agreement. If so, it is the stronger evidence of incapacity and surprize. The defendant, in the very next month after the agreement, sent his father back to the plaintiff, to whom he was to pay $50; and with this, the father and son are represented to be satisfied. It shews how easily they were persuaded to let the defendant pocket two thirds of the sum, at which, as a consideration for the agreement, he had estimated the board the previous month; or that the father and son, if left to themselves, each preferred living with the other, though in the more homely manner the country. As the matter was actually managed, the transaction is one in which the consideration of the conveyances is the personal agreement of the donee, to maintain the donor out of the annual profits of the property conveyed. An agreement of that sort, without any reference to the confidential relation between the parties, or to any state of anxiety and alarm in which the donor was, is, in itself, an object of much animadversion. It is so easy to procure assignments from those who, from decrepitude, mental weakness, and dotage, must have some one to lean on, and are dependent for their comforts and opinions on those around them, as to render vigilance an indispensible duty of the court a *252 gainst imposition in cases of this kind, and to cali for evidence that the agreement was reasonable and prudent; that . , , , , , & , ,, , , . . it had been duly weighed by the party subject to imposition, and been approved of, or at least, known to the nearest members of his family — At the first blush, such a transaction, without explanation, imports undue advantage; for, in effect, one party gets the estate for managing it during the life of the other.
In the case before ns, there is not a single circumstance in favor of the defendant’s conduct. There was no deliberation nor opportunity for it, ofi the part of the donor, nor of consultation with his son and heir apparent. He left home one day, without a thought of any such arrangement, and, on that day, and the next, the business was begun and brought to a close, upon terms which left him no. home, and reduced him to being a pensioner, dependent on his nephew. The answer says, it was a proposal of the uncle, of his own head; and that the defendant at first refused, and at last reluctantly consented, after being repeatedly pressed; and therefore it insists that it was a voluntary act of the uncle, and while he was sober. We have no thought, after reading the evidence, that Steele Buffalow was actually intoxicated, when he executed the instruments before the gentleman who attested them; nor is it doubted, that he was willing, at the moment, to sign them. But it cannot be believed, that the act was voluntary in the sense in which a court of conscience uses that term, namely, that it was an unbiassed act, deliberately assented to, after being fully understood. There is no evidence to those points; and we can hardly imagine any sufficient to establish them. Not a witness saw these two men together, heard a word between them, until the defendant took his uncle to a gentleman to ask his assistance in drawing the deeds. Then, no doubt, he was willing to sign them. But our enquiry, is, how was he rendered thus willing? Did he become so from the action of a competent, collected judgment of his own, of from the prudent counsels of friends disposed to consult his interests? The evidence clearly proves, that Steele Buffalow, though not non com,pos, was always of weak mind, and that it was much impaired. In the hurried *253 state of his feelings at that time, he could not judge tor self — he was entitled to the aid of his friends; and the defendant ought not to have dealt with him until he had such aid. There was no person to propose terms on the part the donor, and his interest was wholly neglected. There is, in this case, every circumstance on which the case of Clarkson v. Hanway, 2 Pr. Wms. Rep. 203, was decided, and many others also. When John Buffalow went to counsel to get the deeds drawn, he does not even request the other ty to accompany him. He simply gives directions for the preservation of his own interests. If the other had gone and placed himself in the hands of the counsel, such papers as these could never have been drawn. The donor is, by them, simply to have life sustained. There is no tion of the place of residence reserved to the donor — no fixed sum allowed, but it is left vaguely open to evasion and litigation, when the donor will have no funds to go to law upon; and the support, thus provided, is secured only by the personal covenant of the nephew. We would, by no means, say, that the validity of an agreement is thought by the court to depend on each or either party having an attorney; or that the intervention of any third party is ordinarily requisite. In this State, most persons bargain for themselves, and put their agreements into writings themselves. But this 1 ° _ w man must be acknowledged to have been incompetent for that. When an attorney, as the common one of both ties, was engaged to draw the instruments, there ought have been an oportumty aiiorded the counsel to see the weak man, receive his directions, or, at least, understand his situation and views, and provide properly against advantage being taken of him, and for the permanent security of ® . rights, under the agreement. When this was not done, and the party’s son was also kept in the dark, until the property had been irrevocably conveyed; and it is found that the agreement, as procured, was unequal and unreasonable, and that the interest of the vendor, under it, is vague and tain, and even that insufficiently secured; there is no al conclusion left for our adoption, but that the weak and tressed man has been drawn into such an agreement by *254 fraud and surprise; and that, on those grounds, he must be re^eve(^ ^ holding the conveyances to be only a security for what has been done under them.
equal »- fracuTbe-so^'Xmii-con -Mon to Ffo°ne°gire dirc;elio,ls sel, who iñs'tTu- *e “at tiie^as1 sunor had 1™.° adyuln” wilh tl,e counsel.
toy661116"4, ordinary c?-mea^or1 ney, nor is them-erven-Sipa* ty But,. in a on® very weak oneon other, the counsel who iscaiied tiiVinstm-moots, ought to have an op-see thety l° receive*his directions, or, at least, understand his situation and views, and prov de proper'y against advantage being taken of him, and far the permanent security of Ids rights under the agreement.
The defendant, Hutchins, must abide by the fate of his co-defendant, through whom he derives his title. There is no proof that he paid the purchase money he says he agreed to . _ ° Utley. That person did not pay any thing either. He Says the land was to be conveyed by way of compromising warrants. But they were not evidences of debts against J ^ °4 Steele Buffalow; for only one had been tried, ancTthe judgment on that was annulled by appeal. It is remarkable, too, Is another feature of imposition on the gentleman of the bar, who drew the other instruments; for they do not speak of the land or other property conveyed, except the ne-groes; and no doubt he was told that the slaves formed the entire consideration for the stipulations on the part of John BuiFalow, or was not told that there was any other.
Upon the whole, therefore, the plaintiff is entitled to an account of the sums paid for his father, and of the value and profits of the slaves and their increase, and of the land and other property; and, upon payment of the balance, to have a re-conveyance.
Per Curiam. Decree accordingly.